# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES L. CLAYTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:08cv1648 DJS |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying James

L. Clayton ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. § 401-433, and supplemental security income ("SSI")

under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of

his complaint; the Commissioner has filed a brief in support of his answer. The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB in August 2005 and for SSI in April 2006, alleging in each

application that he was disabled as of May 3, 2005, by arthritis, a heart attack, high blood

pressure, a staph infection, and depression.[1]  (R.[2] at 315-17.)  His applications were denied

initially and after a hearing in October 2006 before Administrative Law Judge ("ALJ") Robert

E. Ritter.  (Id. at 15-27, 46-50, 325-88.)  The Appeals Council denied Plaintiff's request for

review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id.

at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, his son, and J. Stephen Dolan, M.A., C.R.C.

(certified rehabilitation counselor), testified at the administrative hearing.

Plaintiff testified that he was born on April 3, 1954, and was then 52 years old.  (Id.

at 330.)  He was married and lived with wife, his 77-year old father, his 24-year old son, his

17-year old nephew, his 10-year old grandson, and his 1-year old granddaughter.  (Id. at 331.)

His 16-year old niece would soon be living with him also.  (Id.)

Plaintiff is right-hand dominant.  (Id.)  He graduated from high school and attended

"dealer" school to learn various casino games.  (Id. at 331-32.)

Plaintiff last worked in a landscape business he owned building retaining walls and

decks.  (Id. at 332.)  He did everything, from managing the business to making the bids to

doing the physical labor, including lifting stones weighing between 80 and 105 pounds.  (Id.

at 332, 333.)  He did this work from July 20, 2000, when he quit work at the casino, to May

---

[1]Plaintiff had also applied for SSI in August 2005, but the application had been denied on the grounds that his wife's income was in excess of that necessary to qualify.  The SSI application was then refiled in April 2006 and heard with the DIB application.

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

3, 2005.  (Id. at 334.)  On that date, he had a heart attack as a result of severe hypertension and stopped working.  (Id. at 333.)

Plaintiff quit working at the casino to spend more time with his children[3] – one daughter had died four months earlier – and grandchildren and to start a landscaping business for his son.  (Id. at 334.)  Once he was no longer able to work in the business, the employees could not keep up and the business filed for bankruptcy.  (Id.)  He also filed for personal bankruptcy.  (Id. at 334-35.)

Plaintiff had worked at casinos from 1991 to July 2000.  (Id. at 335.)  He worked from May 1994 to July 2000 as a supervisor or pit boss.  (Id. at 335, 338.)  This required that he supervise all the games and the dealers, take care of the money, and do "crowd control," i.e., break up any fights or arguments.  (Id. at 335.)  He supervised approximately twenty people and worked at least eight hours for at least five days a week.  (Id. at 335-36.)  The heaviest thing he would ordinarily have to lift in that job weighed 15 to 20 pounds.  (Id. at 336.)  The heaviest he occasionally lifted was 20 to 25 pounds.  (Id.)  He usually was standing or walking and seldom sat.  (Id. at 337.)  He also seldom reached, unless he had to fill in for an absent dealer.  (Id.)  The job of dealer required more physical activity than that of a supervisor.  (Id. at 338.)  As a dealer, he would be constantly moving, reaching, and bending over.  (Id.)  He was also always on his feet.  (Id. at 340-41.)  For one job as a dealer he worked nine hours a day for six days a week.  (Id. at 340.)  Another casino required eight hours a day for five days a week.  (Id.)

---

[3]The records indicate he had only one living child, his son.  (Id. at 63.)

For the period from 1991 to February 2003, Plaintiff worked 51 hours a week at a tool and die factory and 40 hours at a casino. (Id. at 341-42.) The factory job was primarily as a tool crib attendant, "maintaining, requisitioning parts, and maintaining the various machines in the machine shop, the grinders, mills, lathes" and installing equipment. (Id. at 342.) In that job, he would have to lift grinder wheels weighing approximately 150 pounds or chucks weighing between 20 and 200 pounds. (Id. at 344.) The job also required that he be on his feet all day. (Id.)

Between 1982 and 1989, Plaintiff operated a bowling alley, which he had built. (Id.) He used to be a professional bowler. (Id.) Before that, he owned a farm and also worked at a factory. (Id. at 345.)

Plaintiff further testified that currently he leaves the house once or twice a week at most. (Id. at 346.) He will ride with someone to the grocery store or to the gas station. (Id.) The grocery store trip lasts approximately 30 minutes; he rides a motorized cart. (Id.) He goes to church approximately once a month. (Id.) He could not climb the stairs to go to the World Series. (Id.) He does not use public transportation, and seldom socializes. (Id. at 347.) His shoulder, knee, and right elbow hurt if he drives. (Id.) He cannot sit for long. (Id.) He last bowled three years ago. (Id.) He does not cook anything that requires that he stand for longer than five or ten minutes. (Id. at 348.) He does not do yard work. (Id.) The most he does around the house is help load the dishwasher. (Id. at 349.) His son does the laundry. (Id.) He will sit on the deck and watch his grandchildren play. (Id.) Sometimes he does not

shave because his left shoulder gets stiff and sore and his right elbow hurts. (Id. at 349-50, 351.) The elbow also hurts when it is rainy and cold. (Id. at 350.)

Plaintiff takes his time when he dresses and first has to put on his left knee brace (he has been wearing the brace since August 2006). (Id. at 350, 356, 357, 358.) He has difficulty putting on sweaters because he cannot get his left arm behind him. (Id. at 350.) He takes showers because he cannot get out of a bathtub. (Id.) He has difficulty getting on and off the toilet. (Id.) He spends all but two or three hours a day laying on the couch with his feet propped up. (Id. at 356.) The only time he does not wear his knee brace is when he goes to bed. (Id. at 359.) The problems with his left shoulder and right elbow occasionally make it difficult to eat. (Id. at 351.)

He injured his left shoulder in a fall and had to have reconstructive surgery. (Id. at 351, 362.) He was supposed to have physical therapy, but cannot afford it after his wife lost her job in March 2006 and their health insurance. (Id.) He also had to have surgery on his right elbow after it developed a staph infection in the summer of 2005 when he was in the hospital for severe hypertension and coronary artery disease. (Id. at 352, 353.)

Plaintiff testified that he could not stand without the knee brace. (Id. at 359, 360.) With the brace and cane, he can stand for five to ten minutes. (Id. at 359-60.) Dr. Berni[4] told him to get a cane; he did, and he uses it all the time. (Id. at 360.) The farthest he can walk using the cane and wearing the brace is 50 feet. (Id. at 361.) Dr. Berni also told him to wear a pad on his right elbow to protect it in case he bumps it. (Id.) At most Plaintiff can lift eight

---

[4]The hearing transcript reads "Burney." The Court will use the correct spelling, "Berni."

pounds, and that is with using both hands.  (Id. at 365.)  He does not do any pushing or pulling.  (Id. at 366-67.)  The longest he can sit is for two hours and that is with his feet propped up.  (Id. at 367.)  He also has difficulty climbing stairs.  (Id.)

Asked to name his worst problem, Plaintiff replied that it was his recurring gout arthritis.  (Id. at 362.)  The gout flares up two or three times a month for two or three days at a time.  (Id.)  He takes medication for it, but the side effects (diarrhea and irritability) are almost as bad as the gout.  (Id. at 362, 364, 369.)  The gout is in his feet and sometimes in his elbow or knee.  (Id. at 363.)  He takes hydrocodone for pain, but it makes him dizzy, drowsy, and nauseous.  (Id. at 368-69.)  He takes trazodone for depression and insomnia.  (Id. at 369.) The lisinopril he takes for high blood pressure also makes him dizzy.  (Id. at 370.)

If Plaintiff had an easy job and could use his cane to stand, he could work for no longer than two or three hours a day.  (Id. at 371.)  He can not work an eight-hour day.  (Id.)  He can not work in security at a casino and monitor cameras because he does not have the necessary computer skills and, regardless of the skills needed, can not stay in one spot.  (Id. at 372.)  Even if he could change positions, he would have to lay down with his feet propped up.  (Id.)

Next to testify was Mr. Dolan, the vocational expert ("VE").  Asked if someone with the pain and discomfort described by Plaintiff and with the measures he takes to treat such would be able to work, the VE replied, "No."  (Id. at 373.)  Plaintiff's gastrointestinal problem which required him to use the bathroom19 times during a 24-hour period would also prevent him from working.  (Id. at 373-74.)  If Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; if he could sit, stand, and walk about 6 hours in an 8-hour

workday; if he could occasionally climb ladders, ropes, and scaffolding, but could never crawl or kneel; if he could never push or pull or work in a hazardous setting, on moving machinery, or around unprotected heights; and if he had to avoid concentrated exposure to extreme cold, to walking on wet or uneven surfaces, and to vibrations, he could work as a pit boss and do some gambling dealer jobs, at least 1,000 of which were in the state economy and 50,000 in the national economy. (Id. at 374-75.) Plaintiff could not work as a pit boss or dealer if he needed to use a cane. (Id. at 375.) The VE's description of the jobs of pit boss and gambling dealers was consistent with that in the Dictionary of Occupational Titles ("DOT"). (Id.) The DOT describes the pit boss job as light work.[5] (Id. at 380.) If the job required, as Plaintiff had explained, that the person had to resurface the games by taking off the old felt, put new felt on, tear the table down, and then put it back together, the work would be at the medium exertional level.[6] (Id. at 380-81.) Plaintiff would be able to work as a pit boss as the DOT described it but not as Plaintiff had. (Id. at 381.)

The next, and last witness, was Plaintiff's son, James Luther Clayton. (Id. at 382.) Mr. Clayton was 24 years old. (Id.) He was trying to finish the retaining walls the landscaping business had agreed to do. (Id.) When his father is taking the gout medication, he is very irritable. (Id. at 383.) His father used to be easy going. (Id. at 384.) He drives his father

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

[6]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds." 20 C.F.R. § 404.1567(c). If someone can do medium work, he can do sedentary or light work. Id.

everywhere.  (<u>Id.</u>)  To him, his father's biggest problem is his knee.  (<u>Id.</u> at 385.)  They have had to rearrange the pantry and the pots and pans to put heavy items on lower shelves.  (<u>Id.</u> at 386.)

## <u>Medical and Other Records Before the ALJ</u>

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, and records from various health care providers.

When applying for DIB and SSI, Plaintiff completed a Function Report.  (<u>Id.</u> at 110-17.)  He described his day as getting up, taking a shower and then his pills, sitting on the deck, watching television, and worrying about everything until he went to bed.  (<u>Id.</u> at 110.)  He did not take care of anyone else and had no pets.  (<u>Id.</u> at 111.)  His wife fed his cat.  (<u>Id.</u>)  He could no longer build retaining walls, bowl, lift things, ride a bike, work, or walk.  (<u>Id.</u>)  He had difficulty sleeping because of his pain.  (<u>Id.</u>)  He also had difficulties bending, bathing, shaving, and sometimes, because of his elbows, feeding himself or using the toilet.  (<u>Id.</u>)  He sometimes could not afford his medication.  (<u>Id.</u> at 112.)  He prepared only meals that had been frozen.  (<u>Id.</u>)  This occasionally took a couple of hours.  (<u>Id.</u>)  He used to be able to cook anything.  (<u>Id.</u>)  He could not mow the lawn.  (<u>Id.</u>)  His only hobby had been bowling; he could no longer bowl.  (<u>Id.</u> at 114.[7])  He went to church once a month.  (<u>Id.</u>)  The only other place he went was to the grocery store, and then his daughter took him.  (<u>Id.</u>)  His

_____

[7]Plaintiff did not answer any questions on page 113, including how often he left the house and whether he drove.

impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use his hands, and get along with others.  (Id. at 115.)  He was irritable and had no patience.  (Id.)  The longest he could pay attention was one hour.  (Id.)  He could walk for only 50 yards before having to stop and rest.  (Id.)  He handled stress and changes in routine well.  (Id. at 116.)  He used a brace and glasses daily and a cane twice a month.  (Id.)

Plaintiff also completed a Disability Report.  (Id. at 155-62.)  He listed his height as 5 feet 8 inches tall and his weight as 200 pounds.  (Id. at 155.)  His limiting impairments were arthritis, heart attack, high blood pressure, staph infection, and depression.  (Id.)  These illnesses first bothered him on February 1, 2000, and caused him to stop work on May 3, 2005, when he had a heart attack.  (Id. at 156.)  Plaintiff explained that his landscaping business did not have a profit in 2001 and 2002.  (Id. at 162.)  When there was a profit, he took 70% and his son took 30%.  (Id.)  The difference was due to his son living with him for free.  (Id.)

A Function Report was completed on Plaintiff's behalf by his wife.  (Id. at 101-09.)  She reported that Plaintiff watched television and did whatever work he could.  (Id. at 101.)  He took a shower and spent time with the family.  (Id.)  He took care of her, his son, his nephew, his daughter, and his granddaughter.  (Id. at 102.)  He also fed an outdoor cat.  (Id.)  Asked how Plaintiff's impairments affected his sleep, she explained that Plaintiff did not sleep well when he was in pain, sometimes had to change hands when eating, and dressed very slowly.  (Id.)  When she was sleeping or working, Plaintiff prepared his own meals of soup

and a sandwich or macaroni and cheese.  (Id. at 103.)  He sometimes could not lift a pan.  (Id.)  He did the laundry, loaded the dishwasher, and used a riding lawn mower.  (Id.)  He did not do these chores very often.  (Id.)  He went outside every day and drove a car.  (Id. at 104.)  He would stop at a store and pick up things they might need that day.  (Id.)  He liked watching car races on television, spending time with his grandchildren and children, and building yardcraft.  (Id. at 105.)  The latter he could no longer do as often as he once did because of his impairments.  (Id.)  His social activities had not changed because they always had preferred to be at home.  (Id. at 105-06.)  His impairments affected his abilities to lift, climb stairs, squat, kneel, bend, use his hands, and walk.  (Id. at 106.)  They had not affected his ability to stand, reach, or sit.  (Id.)  He could lift 20 pounds unless his gout flared up.  (Id.)  He became moody and irritable when under stress.  (Id. at 107.)  He could, however, handle changes in his routine.  (Id.)  He wore a brace and elbow pad and used a cane when his gout flared up.  (Id.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal form in January 2006.  (Id. at 118-24.)  He reported that there had been no change in his condition other than losing strength in both arms.  (Id. at 118.)  He had no new limitations, injuries, or illnesses.  (Id.)  He had seen a doctor for a blood clot in one arm and an infection in another arm.  (Id. at 119.)  He could not pick up anything heavy and, on some days, could hardly walk or stand for any length of time.  (Id. at 122.)

In a Work History Report asking for information about jobs held in the past 15 years, Plaintiff listed two jobs, one as a games supervisor/dealer for casinos and one as a self-

employed construction worker.  (Id. at 147.)  The first required that he walk for four hours each day; stand for four hours; and sit, climb, stoop, kneel, and reach for one hour each.  (Id. at 148.)  The heaviest weight he had to lift, occasionally or frequently, was 20 pounds.  (Id.)  He supervised 20 people.  (Id.)  Plaintiff did not list any specifics for his second job.  (Id. at 149.)

Plaintiff had reported earnings in all but 4 of the 34 years between 1972 and 2003, inclusive.  (Id. at 53, 55-59.)  His annual earnings between 1990 and 2000, inclusive, ranged from $40,526.04 in 1996 to $13,789.75 in 1998.  (Id. at 53.)  His next lowest amount was $21,600.59 in 1991.  (Id.)  He had no reported annual income in 2001 and 2002.  (Id.)  He also had no reported annual earnings in 2004, 2005, or 2006.  (Id. at 55.)  His last reported earnings were $4,052.00 in self-employment in 2003.  (Id. at 53)  Plaintiff attributed the lack of income in 2001 and 2002 to business losses.  (Id. at 67.)

The medical records before the ALJ are summarized below in chronological order.

A brief notation in the medical records of Plaintiff's primary care physician, Dennis Knapik, M.D., dated May 1999 lists Plaintiff's problems as chronic gouty arthritis, coronary artery disease, and hypertension.[8]  (Id. at 213.)

In July 1999, on Dr. Knapik's referral, Plaintiff consulted an orthopaedic surgeon, Anthony J. Berni, M.D., to have his right elbow aspirated to relieve the pain caused by bursitis.  (Id. at 270, 271.)  Dr. Berni also injected cortisone into the elbow, gave Plaintiff a pad to protect it, and recommended he continue with indocin (a nonsteroidal anti-

---

[8]There are two other names, both of which are illegible.

inflammatory drug used for treating, among other things, gout and bursitis). (<u>Id.</u>) Plaintiff was to return in three to four weeks. (<u>Id.</u>) Plaintiff did not keep the next appointment. (<u>Id.</u> at 270.)

Plaintiff did consult Dr. Berni again in February 2000 when the bursitis in his right elbow flared up. (<u>Id.</u> at 269, 270.) Dr. Berni noted that Dr. Knapik had drained the elbow the day before[9] for the seventh time since July. (<u>Id.</u> at 269.) Plaintiff wanted to proceed with a bursal excision. (<u>Id.</u>) Five days later, on February 28, Plaintiff underwent a right elbow bursectomy (the surgical removal of a bursa, or closed sac containing fluid). (<u>Id.</u> at 283.) He was then hospitalized for several days due to severe pain. (<u>Id.</u> at 270.) An x-ray taken on March 1 revealed no gross fracture or joint effusion. (<u>Id.</u> at 282.) When he saw Dr. Berni on March 3, the swelling was resolving and there was no evidence of infection. (<u>Id.</u> at 270.) A new splint was applied; an appointment for the next week was given. (<u>Id.</u>)

When Plaintiff returned the following week, there was no sign of an infection. (<u>Id.</u> at 268.) He was to continue wearing a sling for a few weeks and was to avoid bumping the elbow or resting it on hard objects. (<u>Id.</u>) Three weeks after the bursectomy, Plaintiff had some stiffness and soreness but was feeling well otherwise. (<u>Id.</u>) There was no evidence of an infection or any abnormality. (<u>Id.</u>) He was to stop using the sling but was to use an elbow pad for protection. (<u>Id.</u>) A decision about physical therapy would be made after Plaintiff's next visit, although Dr. Berni opined that it was unlikely he would need it. (<u>Id.</u>)

---

[9]Dr. Knapik's record of this visit is not included in the administrative record.

When Plaintiff again saw Dr. Berni on April 3, he was having difficulty straightening out his elbow.  (Id.)  Otherwise, he was "doing quite well."  (Id.)  His 19-year old daughter had recently died from blood clots after delivering a baby.  (Id.)  Plaintiff was instructed to continue moving his elbow and to try to stretch it.  (Id.)  A decision on formal physical therapy was deferred until the next visit in four to five weeks.  (Id.)

Plaintiff did not return to Dr. Berni until December 22, after he had sustained an injury to his right elbow in a fall.  (Id. at 267.)  The tip of his elbow was tender to palpation.  (Id.)  He had an "excellent range of motion" in the elbow and no wrist or shoulder tenderness.  (Id.)  The impression was of a small hairline fracture that did not need surgical intervention.  (Id. at 267, 272.)  Plaintiff canceled his next appointment and did not show for the rescheduled one.  (Id. at 267.)

On February 12, 2001, the month after Plaintiff failed to keep the two appointments, he consulted Dr. Knapik about his gout and was given a refill of his prescriptions.  (Id. at 210.)  When Plaintiff returned, on September 19, he complained of sporadic chest pain and shortness of breath.  (Id.)  A stress test was negative.  (Id. at 209.)  A few weeks later, Plaintiff reported that he continued to have occasional chest pain below his left collarbone.  (Id.)  After a bone scan was negative, a magnetic resonance imaging ("MRI") was taken of his left shoulder.  (Id.)  On November 23, Plaintiff reported that he was depressed, could not sleep, and had no energy.  (Id.)  He was prescribed a medication[10] and told to return in one month.  (Id.)  Plaintiff returned four months later, in March 2002, for an unrelated reason, i.e.,

---

[10]The name is illegible.

to have sutures removed from his right elbow.  (Id. at 208.)  He next saw Dr. Knapik in June 2002 after spraining his left ankle.  (Id.)

Complaining of pain in his right knee for the past week, Plaintiff went to the St. John's Urgent Care Center at St. Peters ("St. John's") on November 18, 2003, and was apparently seen by Aziz Doumit, M.D.[11]  (Id. at 176-79.)  Plaintiff reported that the pain had become so severe he could not walk or sleep.  (Id. at 176.)  His past medical history included gout and hypertension; the latter was described as no longer present.  (Id.)  On a ten-point scale, with ten being the worst, he rated his pain as an eight.  (Id. at 178.)  He described the pain as constant, sharp, dull, throbbing, and burning.  (Id.)  It was suggested that he wear a brace.  (Id. at 179.)  He was discharged within the hour.  (Id. at 176.)

Two days later, he returned to Dr. Berni to consult him about his right knee pain.  (Id. at 265.)  On examination, he was markedly tender to palpation over the inferior pole of his kneecap.  (Id.)  X-rays were negative.  (Id. at 265, 266.)  Dr. Berni recommended stretching exercises, a brace, ice massages, and anti-inflammatory medications.  (Id. at 265.)  Plaintiff was to return in four weeks if not improved.  (Id.)  Plaintiff had a January 8, 2004, appointment, which he did not keep.  (Id.)

Plaintiff went to St. John's on January 23 with complaints of swelling in his right elbow for the past four days.  (Id. at 173-75.)  His medical history included gout and surgery on the elbow four years earlier.  (Id. at 173.)  The pain was constant, sharp, throbbing, and burning.

---

[11]The signature of the physician is illegible; however, Dr. Doumit's name is typed on the records.

(Id. at 174.)  He was again seen by Dr.Doumit and was discharged within the half hour.  (Id. at 173.)

In February, Plaintiff consulted Dr. Knapik about his gout and swollen, tender feet. (Id. at 204.)  Lab tests were normal.  (Id. at 204, 205-07.)

On May 12, Plaintiff returned to Dr. Knapik, complaining of mid-chest pain that had started the day before and was sharp and quick.  (Id. at 204.)  His left big toe was painful due to the gout.  (Id.)  On examination, Plaintiff's chest wall was tender on palpitation.  (Id.)  He was prescribed medication for both the gout and the chest wall sprain.  (Id.)

On June 8, Plaintiff reported to Dr. Knapik that he was exhausted and had been so for six months.  (Id. at 200-03.)  He was not sleeping well and woke up every hour.  (Id. at 200.) His chest was sore due to climbing stairs and picking up stones.  (Id.)  Dr. Knapik questioned whether the fatigue was caused by the insomnia.  (Id.)  Plaintiff was scheduled for a stress test to investigate the complaints of chest pain and was to avoid exertion.  (Id.)  The stress test was negative; the lab tests were normal.  (Id.)

On March 4, 2005, Plaintiff returned to Dr. Doumit at St. John's after cutting his left forearm on a truck.  (Id. at 168-72.)  The redness around the infection was getting worse and spreading.  (Id. at 168.)  On the ten-point scale, he rated his pain as a four.  (Id. at 171.)  He was discharged within the hour.  (Id. at 168.)

Plaintiff was admitted to St. Joseph Health Center ("St. Joseph") on May 3 after experiencing two weeks of intermittent left-sided chest pain.  (Id. at 200, 230-63.)  Each episode lasted approximately 30 seconds and was accompanied by shortness of breath and

nausea.  (<u>Id.</u> at 231.)  The episodes were not related to exertion.  (<u>Id.</u>)  It was noted that Plaintiff had a history of hypertension, but was not taking his medication and was "very noncompliant with his medication regimen."[12]  (<u>Id.</u>)  His history also included gouty arthritis and hyperlipidemia.  (<u>Id.</u>)  On examination, he was in no acute distress.  (<u>Id.</u>) His chest wall had "some reproducible tenderness over the pain site in the left upper rib."  (<u>Id.</u>)  It was noted that past stress tests had been negative.  (<u>Id.</u>)  A cardiac catheterization was done to rule out coronary heart disease.  (<u>Id.</u> at 234-49.)  The diagnosis was mild to moderate single vessel coronary disease with normal left ventricle function and severe systemic hypertension with bilateral patent renal arteries.  (<u>Id.</u> at 234, 236.)  Plaintiff was discharged on May 5.  (<u>Id.</u> at 200.)

Plaintiff was admitted to St. John's on July 31 with complains of a painful red and swollen right elbow.  (<u>Id.</u> at 163-67.)  His gout medication usually controlled his symptoms, but the pain had been steadily increasing.  (<u>Id.</u> at 163.)  On the ten-point scale, he rated his pain as a six to seven.  (<u>Id.</u> at 165.)  He was transferred to the Barnes-Jewish Hospital-St. Peters ("Barnes") emergency room.  (<u>Id.</u> at 163, 167, 185-96.)  On examination there, his right arm was weak and his elbow was tender, painful, swollen, and warm to the touch.  (<u>Id.</u> at 187.)   His range of movement in the elbow was limited secondary to pain, which he described as a nine on a ten-point scale.  (<u>Id.</u> at 187, 189.)  There was no deformity.  (<u>Id.</u> at 187.)  The diagnosis was bursitis.  (<u>Id.</u> at 188.)  He was discharged home within 90 minutes with a release from work for three days and instructions to avoid heavy lifting.  (<u>Id.</u>)

---

[12]His wife was then working and had health insurance.  (<u>Id.</u> at 230.)

The next day, August 1, Plaintiff saw Dr. Berni for his right elbow. (Id. at 265.) Dr. Berni noted that he had cellulitis[13] about his right elbow and some erythema (redness). (Id.) Dr. Berni recommended a long arm splint, antibiotics, and pain medication. (Id.) Plaintiff was to return on August 4. (Id.)

On August 2, however, Plaintiff was again admitted to St. Joseph. (Id. at 218-29.) He was diagnosed with cellulitis of his right elbow and given intravenous antibiotics. (Id. at 198, 219, 220.) It was noted that, until the previous week, he had had no problem with his right elbow for five years. (Id. at 221.) In the previous week, redness, pain, and swelling had traveled up his arm and he had a decreased range of motion. (Id.) At discharge on August 9, his pain was better. (Id. at 219.)

Plaintiff's right elbow was reportedly doing much better when he saw Dr. Berni on August 22. (Id. at 265.) His range of motion and strength had both improved, although his elbow was still tender when it rested on things. (Id.) He had stopped taking antibiotics four days earlier. (Id.) He was given an elbow pad and was to return in four weeks, sooner if necessary. (Id.) Plaintiff cancelled his next appointment, but returned on September 19, reporting some slight tenderness, no redness, and overall improvement. (Id. at 265, 281.) He was to continue wearing an elbow pad. (Id. at 281.)

Earlier, on September 1, Plaintiff had returned to St. Joseph for a venous examination of his left arm due to swelling and pain. (Id. at 215-17.) The examination revealed

---

[13]Cellulitis is "[a] diffuse, spreading, acute inflammation within sold (nonhollow) tissues" and "is most commonly evident in the skin and subcutaneous structures." Merck Manual of Diagnosis and Therapy, 56 (16th ed. 1992).

superficial thrombophlebitis[14] of the left arm involving the left basilic vein but was otherwise normal.  (Id. at 217.)

Plaintiff consulted Dr. Knapik again on February 8, 2006, about pain in his throat, right elbow, left shoulder, and left arm.  (Id. at 293-94.)  A venous duplex scan of his left upper extremity showed no evidence of venous thrombosis or of venous reflux.  (Id. at 295-97.)  X-rays of his left shoulder and right elbow showed no fractures, but did reveal a borderline widening of his acromioclavicular ("AC") joint in the shoulder.  (Id. at 298.)  It was recommended that stress views be obtained if there was any concern about an AC separation.  (Id.)  There was such a concern, so stress views were taken and were negative.  (Id. at 291, 299.)  An MRI was to be done if Plaintiff continued to feel pain in his shoulder.  (Id. at 291.)  Subsequently, an MRI was done on February 27 and showed tendinosis of the supraspinatus and infraspinatus tendon, without an overt tear; a partial tear of the subscapularis tendon; borderline thinning and perching of the long head of the biceps; and mild downsloping of the acromion, with borderline impression on the distal rotator cuff.  (Id. at 273-74, 300-01.)  It was thought that this latter condition was the probable cause of Plaintiff's symptoms.  (Id. at 274, 301.)  Plaintiff was told that he had a torn rotator cuff and was to see Dr. Berni.  (Id. at 291.)

Complaining of left shoulder pain for the past two months after falling on his shoulder, Plaintiff saw Dr. Berni on March 9.  (Id. at 280, 281.)  On examination, he had pronounced

---

[14]Thrombophlebitis is a "[v]enous inflammation with thrombus ['[a] clot in the cardiovascular systems'] formation."  Stedman's Medical Dictionary, 1809 (26th ed. 1995).

tenderness over his AC joint and some subacromial tenderness.  (Id.)  He had a negative drop arm test.[15]  (Id.)  Noting that the MRI had not revealed a "through and through" rotator cuff tear but a partial tear, Dr. Berni injected the AC joint.  (Id.)  Plaintiff was to return in four weeks.  (Id.)

Three weeks later, on March 27, Plaintiff reported that the effects of the injection had not lasted long.  (Id. at 279.)  Plaintiff elected to proceed with a left shoulder arthroscopy with arthroscopic subacromial decompression, a mini open rotator cuff repair, and an open AC joint resection.  (Id. at 277-78.)  One week later, on April 5, he reported that he was "doing very well."  (Id. at 279.)  He was to do some pendulum exercises and return in three weeks to get started on "some gentle physical therapy."  (Id.)  Plaintiff did not keep the appointment.  (Id. at 276, 287.)

Plaintiff went to the emergency room on August 18 after hearing a "cracking sound" in his left knee when stepping on to a two-foot trailer.  (Id. at 303-05.)  The knee had become stiff, swollen, and painful.  (Id. at 303.)  The range of motion in his left knee was limited by pain.  (Id.)  There was no fracture; he was diagnosed with a sprain of his left knee, was given a knee immobilizer and medication for pain relief, and sent home.  (Id. at 304, 305.)

_____

[15]This test is performed by the patient lowering his or her arm after the shoulder has been abducted to 90 degrees.  University of West Alabama, Drop Arm Test, http://at.uwa.edu/Special%20 Tests/SpecialTests/UpperBody/drop%20arm.htm (last visited Dec. 22, 2009).  An inability to do so without a problem is indicative of a rotator cuff tear.  Id.

Two days later, Plaintiff returned to the emergency room, reporting that the pain continued and was severe. (Id. at 306-07.) He was given medication for pain relief. (Id. at 306.)

When Plaintiff next saw Dr. Berni, on August 21, he explained that he had felt his knee "pop" and felt something tear when he had stood on a chair. (Id. at 287.) His knee had swollen and he had been to the emergency room twice. (Id.) On examination, he did not want to flex and extend his knee. (Id.) He had ligamentous laxity with varus and valgus stressing. (Id.) Dr. Berni aspirated fluid from the knee and scheduled an MRI to rule out a meniscal tear. (Id.) Plaintiff was to continue wearing a knee immobilizer and wrap his knee. (Id.)

The next day, Plaintiff had an MRI of his left knee, revealing a torn anterior cruciate ligament ("ACL"), moderate knee joint effusion (swelling), chrondromalacia patella (a softening of the articular cartilage of the kneecap), a sprain of the iliotibial band and the fibular collateral ligament without a tear, and an approximate one centimeter Baker's cyst.[16] (Id. at 286.) In follow-up, on August 28, Dr. Berni prescribed a double neoprene brace for Plaintiff's left knee and suggested that Plaintiff begin some progressive weight-bearing. (Id. at 285, 287.) Plaintiff reported that he was better after his knee had been aspirated at the previous visit. (Id. at 287.) He was to return in four weeks. (Id.) Plaintiff returned on

_____

[16]A Baker's cyst is a bulge or feeling of tightness behind a knee that "is usually the result of a problem with [the] knee joint, such as arthritis or a cartilage tear." Baker's cyst, http://www.mayoclinic.com/health/bakers-cyst/DS00448 (last visited Jan. 4, 2010). "[T]reating the probable underlying problem usually provides relief." Id.

September 8.  (Id. at 284.[17])  Dr. Berni recommended physical therapy and not surgical intervention.  (Id.)  He also aspirated the swelling, injected some lidocaine, and asked Plaintiff to continue wrapping his knee and wearing the brace.  (Id.)  Plaintiff did not keep his next, September 25 appointment.  (Id.)

The ALJ also had before him the report of a non-examining consultant with the Missouri Section of Disability Determinations, who had completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in November 2005.  (Id. at 125-32.) The primary diagnosis was bursitis of his right elbow, the secondary diagnosis was possibly gout, and other alleged impairments included single vessel coronary artery disease and hypertension.  (Id. at 125.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk, or sit about 6 hours in an 8-hour day.  (Id. at 126.)  His ability to push or pull was limited in his upper extremities by his right elbow pain and stiffness.  (Id. at 126, 127.)  He had postural limitations of occasional bending.  (Id. at 127.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 128-29.)

The same month, James W. Lane, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff.  (Id. at 133-46.)  He found that Plaintiff had an anxiety-related disorder, not otherwise specified, which was not severe.  (Id. at 133, 138.)  This disorder caused mild restrictions in his activities of daily living; mild difficulties in maintaining social

---

[17]The record refers to Plaintiff's right knee.  It is clear from the context, including a reference to the recent MRI, that it was the left knee that was the problem.

functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Id. at 143.)

**The ALJ's Decision**

The ALJ first noted that Plaintiff met the requirements for DIB through December 31, 2006; had not engaged in substantial gainful activity since May 2005; and had vocationally relevant work experience as a construction worker, pit boss, and casino dealer. (Id. at 19.) He next found that Plaintiff had a left shoulder rotator cuff injury, status-post surgical repair, gout, right elbow ligament tear, thrombophlebitis, and knee strain. (Id.) These impairments did not significantly limit his ability to perform basic work-related activities on a twelve-month durational basis. (Id.) Alternatively, assuming Plaintiff's left shoulder and knee impairments to be severe, they were not, singly or combined, of listing-level severity. (Id.)

The question then was whether Plaintiff's impairments precluded the performance of past relevant work or of other work. (Id.) The ALJ reviewed Plaintiff's hearing testimony and his medical records, noting that the May 2005 hospital records showed that he had stopped taking his prescription anti-hypertension medication and was noncompliant with his medication regimen and that his cardiac condition could be managed with anti-hypertension medication. (Id. at 19-20.) The ALJ also noted that Plaintiff had returned to heavy work after his elbow surgery in 2000 and that his condition of cellulitis had improved with a change of medication. (Id. at 20.) He considered Plaintiff continuing to direct the operations of the landscaping business after his disability onset date as a factor that detracted from Plaintiff's

credibility.[18]  (Id.)  Also, Dr. Berni's notes of September 2005 indicated that Plaintiff had minimal elbow tenderness and no redness and opined that Plaintiff was doing much better. (Id.)  Plaintiff was also "doing very well" after his rotator cuff repair.  (Id.)

Plaintiff's left knee complaints were found to be inconsistent with the treatment records.  (Id. at 21.)  The ALJ noted that Dr. Berni had recommended physical therapy, but Plaintiff had not complied.  (Id.)  Also, the findings of Dr. Knapik in February 2006 and the St. John's emergency room records of August 2006 were inconsistent with a severe knee-related condition lasting at least twelve months, "especially with compliance with treatment directives."  (Id.)

The ALJ noted Plaintiff's allegations of side effects of sleepiness and potential heart problems from psychoactive medication, but found no indication that he had reported such to his doctors.  (Id. at 22.)  Although he had been prescribed anti-depressant/anti-anxiety medication, he had not sought psychiatric treatment.  (Id.)  Moreover, his activities were inconsistent with the presence of a severe or disabling mental impairment.  (Id.)  Although Plaintiff had been diagnosed with a left shoulder rotator cuff tear and left knee strain, he did not take strong pain relief medication.  (Id. at 23.)  Although he had been diagnosed with a left shoulder rotator cuff injury, status-post surgical repair, hypertension, gout, right elbow ligament tear and cellulitis, thrombophlebitis, and knee strain, "he [did] not seek regular and sustained treatment for these conditions . . . ."  (Id.)  There was no evidence that his gout had

_____

[18]The ALJ later noted that although Plaintiff had stopped working in May 2005, he reported after that that he had his own business.  (Id. at 24.)

- 23 -

flared-up recently.  (Id.)  There was evidence, however, that Plaintiff's impairments could be controlled with medication and treatment.  (Id. at 24.)  There was no evidence that any physician had ever found or imposed any long-term, significant restriction on Plaintiff's functional capacity.  (Id.)

The ALJ also noted that there was no evidence that Plaintiff had been denied any treatment or refused any medication because of a lack of funds.  (Id. at 23.)  Moreover, he had had medical insurance until March 2006.  (Id.)  And, Plaintiff had failed to show any good cause for his repeated failure to comply with medical directives.  (Id. at 24.)  The conditions which initially caused Plaintiff to reduce his work had improved within a few months.  (Id.)

Plaintiff did have, the ALJ found, some genuine medical problems that caused functional limitations.  (Id.)  Specifically, he had the residual functional capacity ("RFC") to perform work *except* for work that required him to frequently lift more than ten pounds or occasionally lift more than twenty pounds, to climb scaffolds or ladders, or to crawl, kneel, or push/pull arm controls.  (Id. at 24-25.)  He should also avoid extremes in temperature, any humidity, and close proximity to workplace hazards.  (Id. at 25.)  This RFC did not preclude him from performing his past relevant work as a pit boss, as actually performed and as performed in the national economy, or as a casino dealer, as generally performed in the national economy.  (Id.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 26.)

### Additional Medical Record Before the Appeals Council

After the ALJ entered his adverse decision, Plaintiff's counsel forwarded to the Appeals Council an undated letter from Dr. Doumit, which reads as follows.

> [Plaintiff] . . . has suffered from severe gouty arthritis for several years. In fact, I treated him even when I worked at other facilities before, over the past 4 years, for this illness. Despite Allopurinal, Colchicine, and other anti-inflammatory medications, his pain at times has been so severe that he could not work for several days. I anticipate he would continue to miss work a considerable number of days per month, greater than 10 due to this illness. Despite all of that, he has tried to work as well to avoid becoming addicted to pain killers. He tries to take good care of his health through life style and diet regimes, but unfortunately his gout is very severe in nature.

(Id. at 321.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th

Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical

records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R. § 220.130(a). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as

untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d

891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ failed to (a) properly complete and support his RFC assessment of Plaintiff; (b) make explicit findings on the physical demands of his past relevant work; (c) assess the combined effect of his impairments; and (d) evaluate the testimony of his son. The Commissioner disagrees.

The ALJ found that Plaintiff retained the RFC to perform work requiring him to frequently lift ten or less pounds and occasionally lift twenty or less pounds and did not require him to (i) climb scaffolds or ladders, (ii) crawl or kneel, (iii) push or pull arm controls, and (iv) be exposed to extremes in temperature, humidity, and workplace hazards. The hypothetical question he posed to the VE included an ability to sit, stand, and walk about six hours in an eight-hour day. The VE testified that, with this RFC, Plaintiff could work as a pit boss as that job is defined in the DOT. The VE did not, however, specify which DOT classification he was referring to. This omission is significant because the DOT classifies a "pit boss" only in the context of automobile racing. The DOT does arrange a group of occupations under the heading of "343 – Gambling Hall Attendants." Dictionary of Occupational Titles, 1991 WL 672850 (4th rev. ed. 1991). This group includes such jobs as gambling monitor, 343.367-014; gambling dealer, 343.464-010; and floor attendant, 343.467-

014.  The Commissioner argues in his supporting brief that the first two jobs correspond to

those referred to by the VE.[19]  A gambling monitor

> [o]bserves patrons and employees participating in gambling activities to detect
> infractions of house rules:  Watches participants in games such as dice or cards
> to detect cheating, identify rule violators, and observe persons designated by
> superior.  Speaks or signals to supervising personnel using hand, telephone, or
> voice to identify and supply information about suspected violators.  May
> examine dice periodically to check for damage or substitution.  May calculate
> winnings to verify payment made by dealer.

Dictionary, 1991 WL 672854.  This job requires level 3 math skills; algebraic skills of being

able to calculate variables and formulas, monomials and polynomials, and square roots; and

geometric skills of being able to calculate plane and solid figures, circumference, area, and

volume.  Id.  The job may require pushing and/or pulling of arm or leg controls or of

materials.  Id.  The job does not require several of the other exertional limitations found by

the ALJ, e.g., no crawling or kneeling, no exposure to extreme temperatures or humidity, and

no climbing.  Id.  A gambling dealer

> [c]onducts gambling table, such as dice, roulette, or cards, in gambling
> establishment: Exchanges paper currency for playing chips or coin money.
> Ensures that wagers are placed before cards are dealt, roulette wheel is spun,
> or dice are tossed.  Announces winning number or color to players.  Computes
> payable odds to pay winning bets.  Pays winning bets and collects losing bets.

Dictionary, 1991 WL 672855.  This job also may require pushing and/or pulling of arm or leg

controls or of materials.  Id.  It requires the same math, algebraic, and geometric skills as does

---

[19]The Commissioner does not disagree with Plaintiff's contention that the ALJ did not resolve
the discrepancy between his testimony about his casino jobs as he performed them and the restrictions
on his RFC found by the ALJ.  Thus, the focus is on the jobs as they are generally performed and not
on how they were actually performed by Plaintiff.

the job of gambling monitor.  Id.  The job of floor attendant, not cited by the Commissioner, may require pushing and/or pulling of arm or leg controls or of materials.  Dictionary, 1991 WL 672857.

The ALJ included in his hypothetical question to the VE an inability to push or pull arm controls.  The VE answered that Plaintiff could work as a pit boss, at least as that job was defined in the DOT, and "do some gambling dealer jobs."  (Id. at 374.)  The VE further answered that 1,000 of these jobs existed in the state economy.  Lacking a reference to what specific occupation the VE considered to be a "pit boss" and to whether the "some" gambling dealer jobs were those that did not require pushing and/or pulling of arm controls, the existence of a significant number of jobs in the state or regional economy that Plaintiff could perform has not been supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 423(d)(2)(A) (defining the necessary finding of "'work which exists in the national economy'" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country").[20]

The VE also testified that Plaintiff could not work as a pit boss or as a gambling dealer if he needed to use a cane.  Plaintiff testified that he needed to use a cane all the time; when applying for DIB and SSI, he stated he needed to use it twice a month.  The ALJ did not

_____

[20]This statute also provides that the question of whether there is work in the national economy which a claimant can perform is to be answered without regard to whether the claimant would be hired.  42 U.S.C. § 423(d)(2)(A).  See also 20 C.F.R. § 404.1566(c) (claimant will be found not disabled if he remains unemployed because, among other things, he is unable to get work or he "would not actually be hired to do work [he] could otherwise do . . . .").  Thus, any concern that Plaintiff might not be hired because of his age (his wife had been fired from her casino job because of her age) is not relevant to the question of whether such work exists.

address whether Plaintiff's allegation of needing a cane and how frequently was credible, nor did he address how the undisputed evidence that Plaintiff was prescribed a knee brace, advised to wear one, and did so affected his RFC to stand or walk. There is no evidence in the record as to the effect of the need to use a brace on Plaintiff's ability to work in casinos.

Plaintiff argues that his need to frequently use a bathroom because of the side effects of a medication prevents him from working. The VE agreed that such a need would preclude Plaintiff from the referenced jobs. The ALJ did not find this urgency to be credible, properly noting that Plaintiff had not reported this side effect, one which clearly would be remarkable, to any of his physicians. See **Zeiler**, 384 F.3d at 936 (ALJ did not err in not considering side effect when claimant had never complained of such to her doctors); accord **Depover v. Barnhart**, 349 F.3d 563, 566 (8th Cir. 2003).

Citing Dr. Doumit's letter, Plaintiff also argues that flare-ups from his gout prevent him from working. The only evidence that Dr. Doumit treated Plaintiff is the records from St. John's. Those records reflect brief, emergency room visits and lack any indication of how long Dr. Doumit saw Plaintiff. His undated letter includes references to Plaintiff being unable to work for several days due to his pain and to Plaintiff trying to work to avoid an addiction to pain killers. He also opines that Plaintiff would miss more than ten days a month due to his illness. Nothing in the emergency room records support these broad conclusions. Clearly, Dr. Doumit does not base his observations and conclusions on his own records. The ALJ did not err by not including severe gout flare-ups in his hypothetical question to the VE. See **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount

treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); accord **Vandenboom**, 421 F.3d at 749; **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996).

The ALJ did not mention in his decision the corroborating testimony of Plaintiff's son. Disagreeing with Plaintiff, the Commissioner argues that the omission is not reversible error because the son's testimony mirrored that of Plaintiff, whose testimony was discredited for specific, explained reasons. See **Young v. Apfel**, 221 F.3d 1065, 1068 (8th Cir. 2000) (ALJ did not err by not specifically discrediting testimony of claimant's husband because same evidence that supported adverse credibility assessment of claimant supported ALJ's disregard of husband's testimony); accord **Lorenzen v. Chater**, 71 F.3d 316, 319 (8th Cir. 1995); **Robinson v. Sullivan**, 956 F.2d 836, 841 (8th Cir. 1992). The ALJ gave explicit reasons for discrediting Plaintiff's testimony, including his failure to be compliant with his medication regimen, see **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005), his failure to keep follow-up appointments, see **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005), his failure to seek continuing medical care for several of his complaints after their apparent resolution, see **Ostronski v. Chater**, 94 F.3d 413, 419 (8th Cir. 1996), and the lack of any continuing restrictions on Plaintiff by his physicians,[21] see **Raney**, 396 F.3d at 1011; **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir.

---

[21]Dr. Doumit's opinion is not supportive for the reasons set forth at page 34, supra.

1999). These findings are not challenged.[22] The Court finds that the ALJ's failure to explicitly discuss and discredit Plaintiff's son's testimony is not reversible error.[23]

## Conclusion

Plaintiff might not be disabled within the meaning of the Act. The ALJ's finding that he can perform his past relevant work as a pit boss and casino dealer, however, is not supported by substantial evidence on the record as a whole for the reasons set forth above. Accordingly, the case should be remanded for a further clarification and explanation of Plaintiff's RFC and the availability of work existing in the national economy consistent with that RFC. Therefore,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **up to and including January 18, 2010**, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file

---

[22]Plaintiff does take issue with the ALJ's conclusions that he informed a doctor that he was in the landscaping business after his disability onset date, that the reason he did not return to the business was it filed for bankruptcy, and that he did not participate in physical therapy for reasons unrelated his financial resources. The first two conclusions are not supported by the record. The record also indicates that his wife lost her job and their health insurance before the referral for physical therapy.

[23]The Court notes that Plaintiff's son lives with him and did not, according to Plaintiff, pay rent. See **Choate v. Barnhart**, 457 F.3d 865, (8th Cir. 2006) ("Corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case.").

timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of January, 2010.